Manfred P. Muecke (SBN 222893)
**Manfred, APC**
600 W Broadway Ste 700
San Diego CA 92101
Tel: (619) 550-4005
Fax: (619) 550-4006
mmuecke@manfredapc.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| Jeff Ibach, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>Adidas America, Inc.,<br><br>Defendant | **Class Action Complaint**<br><br>Jury Trial Demanded |

Plaintiff Jeff Ibach ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      Adidas America, Inc. ("Defendant") manufactures National Hockey League ("NHL") jerseys represented as "authentic" ("Product").

## I.  BOOMING BUSINESS OF SPORTS MERCHANDISE

2.      Sales of sports merchandise in the United States is close to $20 billion per year.

3.      This generates millions of dollars for teams through royalties and is an increasingly important revenue source.

4.      According to the author of *The Fastest Game in the World: Hockey and the Globalization of Sports*, "[t]he current popularity of the[se] colorful, oversized shirts is the result of changes in marketing and fan culture, in hockey as well as other

1

sports."[1]

5.      Until relatively recently, "fans went to the arena in everyday street clothes," and "[t]he trend of putting on what the players wore first emerged in European soccer in the 1980s."

6.      Berglund noted that "NHL crowds from the early '90s show that most fans didn't give second thought to what they wore."

7.      However, fans at hockey games, like at the Penguins game shown below, are passionate about wearing their team's jerseys.



8.      One sociologist explained commitment to a particular sports team "crosses many areas of society such as wealth, position, race, and religion."[2]

9.      The most significant and expensive of such merchandise is the team jersey, often bearing the name of the wearer's favorite player.

10.      The jersey signifies the fan's loyalty to his or his team and provides an opportunity to enhance a relationship with the team.

---

[1] Bruce Berglund, *How Hockey Jerseys Became Standard Wear for Fans*, University of California Press Blog, Dec. 18, 2021.
[2] Norm O'Reilly, et al., "*Merchandise Sales Rank in Professional Sport: Purchase Drivers and Implications for National Hockey League Clubs*," Sport, Business and Management: An International Journal (2015).

11.     One apparel executive recognized this fact, stating "We're selling emotion, observed not just a product."[3]

12.     This is supported by relatively low sales for specialty jerseys designed to mark an event or occasion, as opposed to standard jerseys players wear on-ice each night.[4]

13.     National retailer Dick's Sporting Goods identified the three types of hockey jerseys as Authentic, Official, and Replica.[5]

14.     According to Dick's, "[n]ot all jerseys are cut from the same cloth," because "[s]ome might be designed for in-game action, while others are best suited for your gameday party."

15.     By knowing the "differences between authentic and replica jerseys," fans can "match [their] gear to [their] needs." *Id.*

16.     Hockey jerseys identified as "authentic" "are the on-ice apparel worn by your favorite professional team."

17.     This is consistent with historical usage and understanding, because for decades, "authentic" in the context of NHL jerseys referred to jerseys worn on the ice by NHL players.

18.     Adidas knows "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

## II. JERSEYS REPRESENTED AS AUTHENTIC, UNDERSTOOD BY FANS AS WORN "ON ICE"

19.     Consumers purchasing NHL jerseys marketed as "authentic" by the company which makes the jerseys worn by NHL teams will expect they are

---

[3] Tim Layden, *We Are What We Wear: How Sports Jerseys Became Ubiquitous in the U.S.*, Sports Illustrated, Feb. 1, 2016.
[4] Keener Jerseys, Jerseys Unite Teams, Fans and Communities.
[5] *Authentic vs. Replica Jerseys: What's the Difference?*, Pro Tips, Dick's Sporting Goods, Sept. 19, 2019

purchasing jerseys identical to those worn on the ice by NHL players. [6]

20.     For example, on its website and in digital, print, radio and/or television marketing, Defendant promotes Winnipeg Jets jerseys as "The Official Home Game Jersey of the Winnipeg Jets," telling hockey fans it is an "authentic home game jersey," "Imported" and "Officially licensed by the NHL."



21.     Defendant authorizes third parties, such as Fanatics.com, official team stores, and the NHL to sell its jerseys and provides them with specific language to use in its marketing.

22.     At its instructions and directions, third-party stores and websites such as fanatics.com identify these jerseys as "authentic" by labeling them with names such as "Authentic Pro Player Jersey."

_____

[6] AJ Strong, *Stop Calling Adidas NHL Jerseys Authentic*, Teal Town USA, June 29, 2021.

4



23.    Defendant capitalizes on consumers believing and expecting the jerseys are authentic, shown through one website description that "this jersey is the same as the one Oilers players wear when the puck drops."[7]

### OILERS AWAY AUTHENTIC PRO JERSEY

THE OFFICIAL AWAY GAME JERSEY OF THE EDMONTON OILERS.

Celebrate Edmonton hockey as they turn up the intensity away from home. Featuring an authentic tie-down fight strap with a hook-and-loop and snap closure, this jersey is the same as the one Oilers players wear when the puck drops on the road. The relaxed fit provides extra room.



---

[7] The representations for the team identified here are substantially similar or identical to those made for all NHL teams.

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*

24.    Defendant describes its "Authentic Pro Player jersey" for the Detroit Red Wings as "Featuring sewn-on team graphics, a tie-down fight strap and moisture-absorbing AEROREADY fabric, this jersey features the same details that Dylan Larkin wears on game day."

**Description**                                                          –

There's nothing more exciting than watching Dylan Larkin hit the ice and lead the Detroit Red Wings to a win. Cheer on this top NHL player with this Authentic Pro Player jersey from adidas. Featuring sewn-on team graphics, a tie-down fight strap and moisture-absorbing AEROREADY fabric, this jersey features the same details that Dylan Larkin wears on game day. Take any fan look to the next level with this must-have Detroit Red Wings jersey.

25.    That these jerseys are "the same as [] players wear" is confirmed to purchasers due to features which would only be relevant in on-ice jerseys, by highlighting its functionality.

26.    These include its promotion of "AEROREADY [which] keeps you cool and dry," "[A] mesh underarm insert," "Primegreen, a series of high-performance recycled materials," "Loose fit," "Moisture absorbing" and having an "Authentic tie-down fight strap with a hook-and-loop snap closure."

Captured at: 03/18/2023, 07:12 PM
URL: https://hockeyauthentic.com/products/any-name-and-number-winnipeg-jets-reverse-retro-authentic-adidas-nhl-jersey-customized-primegreen-model

**THIS JERSEY WILL FEATURE PROPER HAND STITCHED SINGLE LAYER TWILL CUSTOMIZATION LIKE THE PLAYERS WEAR.**

- Officially licensed by the NHL
- Official NHLPA name and number pro stitched just like the players wear
- 100% polyester
- Made with Primegreen - a series of high-performance recycled materials
- Authentic tie-down fight strap with hook-and-loop and snap closure

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*

27.     Most significantly, the jerseys are marketed as having a "tie-down fight strap," the attachment on hockey jerseys which keeps them from being pulled over their heads during the fights which inevitably break out during hockey games.

28.     There is no reason to include a "fight strap" on a jersey that is not meant to be worn on-ice, because this is solely a utilitarian feature relevant to being on skates in a hockey fight.

29.     By emphasizing that the Product is made with a fight strap, consumers will expect it is identical to on-ice jersey.

30.     However, despite the representations as "authentic," the jerseys are not those worn on-ice by NHL players.

31.     First, the fight straps in Defendant's authentic jerseys are lower quality than in the on-ice jerseys worn by the players.

32.     In the on-ice jersey (left), the fight strap contains a double layered reinforced base, while the Authentic (right) is affixed through a single stitched layer.

 

33.     Second, in the on-ice jersey (left), the dimples or small holes are significantly larger, because they were created through the machines which mechanically press the jersey, while those in the Authentic (left) appear added only for aesthetics.

 

34.     This difference is relevant because these small holes allow air to flow through the jersey, an important feature relevant to its on-ice performance.

35.     The smaller dimples in the Adidas authentic jerseys render them less efficient at dealing with moisture and airflow than the on-ice jerseys.

36.     Third, the fabric in the authentic jerseys is half the thickness of the fabric used in the on-ice jerseys worn by NHL players.

37.     Fourth, the stitching used in the authentic jerseys is weaker and less durable than in the on-ice jerseys.

38.     Fifth, the authentic jerseys are "Made in Indonesia" while the on-ice jerseys are "Made in Canada."

39.     By describing the authentic jerseys as "Imported" on its website and other marketing materials, hockey fans will expect this refers to Canada, the birthplace of ice hockey.

40.     As the world leader – and inventor of hockey – Canada has institutional knowledge of all aspects of this winter sport, passed down through generations of craftsmen.

41.     In contrast, the tropical temperature of Indonesia has never been suitable for playing ice hockey.

42.     The authentic jerseys (middle) are closer to counterfeit Adidas NHL

jerseys (bottom) than to those worn on the ice by NHL players (top).



43.    The jerseys have more in common with what is commonly described as "replica" or even counterfeit authentic jerseys than those worn by players on the ice during games.

44.    The representation of the Products as "authentic" is misleading, because they are more accurately described as "replicas."

45.    Defendant has been aware that eagle-eyed consumers have discovered the differences between its authentic jerseys and those worn by players on the ice.

46.    First, a website devoted to covering the San Jose Sharks, TealTownUsa.com, published an article by AJ Strong, entitled, "*Stop Calling Adidas NHL Jerseys Authentic*," in June 2021.

47.    Strong provided detailed facts about why "it's disingenuous and misleading for Adidas to call [the jerseys] 'authentic' or 'authentic pro'" and recommended "Adidas [] call[s] those jerseys what they are… replicas."

48.    "Products marketed legally and manufactured by the firms owning the production rights of the brand using original ingredients, genuine parts, and raw materials have been referred to as authentic market offerings."

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*

49.     "Inauthentic products, on the other hand, are fine copies of the authentic ones They may range from compatibles (e.g., IBM compatible battery), imitations (e.g., imitation crab meat), and replicas (e.g., jewelry) to illegal counterfeits."

50.     "While authentic refers to something that is not a copy, hence is of undisputed origin, replica refers to an exact copy or replication of original items, such as paintings as well as other products, and resemble the original in terms of appearance and shape."

51.     "When it comes to purchasing items be it paintings, apparel and even accessories, it is important to differentiate between the authentic product and the replica as the pricing and quality are different."

52.     Strong also notified Adidas that the prices of their "authentic" jerseys were $50 greater than what comparable replica NHL jerseys are sold for.

53.     Second, another fan of the San Jose Sharks, the well-known memorabilia and video game blogger known as "Rezrection," expounded on Strong's points about these jerseys.

54.     Rezrection posted a video to his YouTube channel entitled, "*Do Not Buy Adidas NHL Authentic Hockey Jerseys Before Watching This Video! What You Need To Know!*"

55.     Over nine minutes, Rezrection isolated numerous ways in which the authentic Adidas NHL jerseys were deficient compared to the on-ice jerseys.

56.     Rezrection cautioned his viewers to be careful about paying almost as much for the authentic jerseys as the on-ice jerseys would cost, given what he described as stark differences in quality.

57.     Hockey fans at the popular website reddit.com weighed in on the controversy.

58.     One commenter posited that "[t]he reason they market the current

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*

1  Indodidas as 'authentic' is because … Fanatics has the contract to sell replicas."[8]

2  59.  This is why Adidas "slap[s] a fight strap on some incredibly cheap

3  replicas and brand them as 'authentic.'"

4  60.  However, "If Adidas were to bring the MiC [Made in Canada worn by

5  players] to retail and market it (or even quietly hang one in the team store next to the

6  Indos), the illusion that the current retail jerseys are authentic would be broken in the

7  eyes of the average fan."

8  61.  The result would be that "Adidas would lose out on sales on the far more

9  lucrative replica 'authentic' market that they currently have cornered."

10  62.  Another user remarked that:

11  It's not just calling them authentic. It's saying
   stuff like "the official home game jersey" or
12  the fact that in the beginning they were
   marketed as "on ice" jerseys, which they
13  clearly are not.

14  To those who don't follow this stuff, they
15  would think they are getting what the players
   wear and they most definitely are not.

16

17  Captured at: 03/18/2023, 07:53 PM
18  URL: https://www.reddit.com/r/hockeyjerseys/comments/o
19  alx5b/stop_calling_adidas_nhl_jerseys_authentic_teal/

20  [deleted] · 2 yr. ago

21  It's not just calling them authentic. It's saying stuff like "the official home game
   jersey" or the fact that in the beginning they were marketed as "on ice" jerseys,
   which they clearly are not.

22
23  To those who don't follow this stuff, they would think they are getting what the
   players wear and they most definitely are not.

24  ⬆ 4 ⬇  Share  ···

25  63.  Adidas, like most large companies, regularly monitors social media for

26

27  [8] *Stop Calling Adidas NHL Jerseys Authentic - Teal Town USA*, Reddit.com;
   Indodidas used by poster to refer to Indonesian-made "authentic" jerseys instead of
28  Canadian-made actual authentic jerseys worn by NHL players.

mentions of its brand, and was informed, directly or through its agents, of the issues identified by Strong and Rezrection.

64.     Whether the term used is "knock-off, replica, counterfeit, or even the most obvious of terms: fake; it is all referring to the same rising phenomenon of imitated products."

65.     Studies have shown that consumers form their perception of product authenticity via intrinsic cues (product exposures/experiences, actual product quality) and extrinsic cues (explicit messages, inconspicuous cues) provided by manufacturers.

66.     These indicated that based on consumers' authenticity perception, they are willing to pay significantly more money for the real thing.

67.     Moreover, "even though consumers highly valued authentic products, they were mostly unable to distinguish them" from replicas, sometimes referred to as "counterfeit" or "knock-offs."[9]

68.     "Unless a consumer is well informed about the particular characteristics of the authentic product, it is difficult to discern whether a product is real or fake."

69.     "There is also a large market of disguised replica products that are not identified as being either replica or counterfeit."[10]

70.     This can lead to significant consumer confusion since consumers believe they are purchasing authentic products like the jerseys worn by NHL players on the ice.

## **PARTIES**

71.     Plaintiff Jeff Ibach is a citizen of Fullerton, Orange County, California.

72.     Defendant Adidas America, Inc. is an Oregon corporation with a

---

[9] Nguyen, Hang, and Kunter Gunasti. "Authenticity is in the eye of the beholder: From changes in attitudes and preferences to placebo effects." ACR North American Advances (2011).

[10] Slocum, Jenny T., and Jess M. Collen. "The evolving threat and enforcement of replica goods." W. New Eng. L. Rev. 33 (2011): 789.

principal place of business in Portland, Multnomah County, Oregon.

73.     Adidas manufactures jerseys for the National Hockey League.

74.     Consumers know they can trust a sportswear product with Adidas' well-known three stripes to deliver what it promises.

75.     Plaintiff purchased an Adidas authentic NHL Seattle Kraken jersey, among others, at in-person retailers and/or online, between September 2019 and the present.

76.     Plaintiff believed the Product was authentic, understood as being the same jersey that the Kraken players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

77.     Plaintiff relied on the Product's features such as its fight strap, to believe it was the one worn on ice by the players.

78.     Plaintiff read, reviewed, and relied on Defendant's representations that the jerseys were authentic and/or was exposed to its language on the hang tags and internet sites that he was buying the same jersey worn by players "when the puck drops" on the ice.

79.     Plaintiff was aware the jerseys had features such as an "authentic tie-down fight strap with a hook-and-loop and snap closure," which serve no purpose in a jersey not designed and sold for use on the ice by NHL players.

80.     Plaintiff bought the Product because he expected it was authentic, and the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, because that is what the representations said and implied.

81.     As a result of the false and misleading representations, the Adidas "authentic" jerseys are sold at premium prices, approximately not less than $200, excluding tax and sales.

82.     Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's site and those of its third-party partners, about

13

its authentic jerseys.

83.     Plaintiff was disappointed because he believed the Product was authentic, understood as being identical to that worn on the ice by NHL players during games, even though it was not the same jersey worn by members of the Seattle Kraken and other NHL players.

84.     Plaintiff bought the Product at or exceeding the above-referenced price.

85.     Plaintiff would not have purchased the Product if he knew the jerseys were not identical to those worn on the ice by NHL players, or would have paid less for them.

86.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, as those worn on the ice by NHL players.

87.     Plaintiff paid more for the Product than he would have had he known the representations and omissions were false and misleading, or would not have purchased it.

88.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

89.     Plaintiff intends to, seeks to, and would purchase Adidas authentic jerseys again when he can do so with assurances those jerseys were identical to those worn on the ice by NHL players.

90.     Plaintiff is unable to rely on the labeling of not only Adidas authentic NHL jerseys, but other sports apparel represented as authentic, because he will be unsure of whether those representations are truthful.

91.     If Defendant was compelled to truthfully describe its hockey jerseys as "replicas" and not "authentic," Plaintiff would have more confidence in the promises of other companies selling sportswear described as authentic.

**JURISDICTION**

92.     Plaintiff is a citizen of California.

93.     Defendant is a citizen of Oregon.

94.     The Court has jurisdiction over Defendant because it transacts business within California and sells the Product to consumers within California from its website, third-party retail sporting goods stores and websites, team shops at NHL arenas, and licensed apparel retailers, and/or online in this State.

95.     Defendant transacts business in California, through the sale of the Product to consumers within California from its website, third-party retail sporting goods stores and websites, team shops at NHL arenas, and licensed apparel retailers, and/or online in this State.

96.     Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

97.     Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

98.     Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

99.     This Court has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

100.    The aggregate amount in controversy exceeds $5 million, including any

15

1    statutory and punitive damages, exclusive of interest and costs.

2        101.   The class of persons Plaintiff seeks to represent includes persons who
3    are citizens of a different state from which Defendant is a citizen.

4        102.   The members of the class Plaintiff seeks to represent are more than 100,
5    because the Adidas authentic jerseys are sold to consumers from its website, third-
6    party retail sporting goods stores and websites, team shops at NHL arenas, and
7    licensed apparel retailers in the State Plaintiff seeks to represent for the past several
8    years.

9    **<u>VENUE</u>**

10       103.   Venue is in this District because Plaintiff is a resident of Orange County.

11       104.   Venue is in this District because a substantial part of the events or
12   omissions giving rise to these claims occurred in Orange County, which is where
13   Plaintiff's causes of action accrued.

14       105.   Plaintiff purchased and/or used the Product in reliance on the labeling
15   identified here in Orange County.

16       106.   Plaintiff became aware the labeling was false and misleading in Orange
17   County.

18   **<u>DIVISIONAL ASSIGNMENT</u>**

19       107.   Pursuant to General Order No. 23-05, In the Matter of Assignment of
20   Cases and Duties to District Judges, and Rule I.B.1.a.(1)(c) ("Non-Removed Cases
21   Not Involving the United States"), this Action should be assigned to the Southern
22   Division.

23       108.   This assignment is because 50% or more of the plaintiffs who reside in
24   this District reside in the Southern Division, in Orange County.

25   **<u>CLASS ALLEGATIONS</u>**

26       109.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following
27   Class:

28           **California Class:** All persons in California who

purchased the Product in California during the statutes of limitations for each cause of action alleged.

110. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

111. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

112. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

113. Plaintiff is an adequate representative because his interests do not conflict with other members.

114. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

115. The class of persons is sufficiently numerous because Defendant has sold the Product with the identified representations for several years throughout this State, and it was bought by hundreds, if not thousands, of consumers.

116. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

117. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

118. Plaintiff seeks class-wide injunctive relief because the practices continue.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***

119.   Plaintiff incorporates all preceding paragraphs.

120.   The UCL prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.

121.   Defendant's conduct, representations, and omissions are "unlawful" because it violates California's False Advertising Law, BPC § 17500, *et seq.* ("FAL"), and Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA").

122.   Each of the challenged statements and omissions made and actions taken by Defendant as described violates the FAL, and therefore violates the "unlawful" prong of the UCL.

123.   Defendant's conduct was and continues to be unfair and fraudulent because it made materially false representations and omissions that caused consumers to believe the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

124.   Defendant is aware of the representations and omissions it has made about the Product with respect to it being authentic.

125.   Had Plaintiff been aware of Defendant's practices, he would not have purchased the Product or paid as much, suffering damages.

126.   In accordance with BPC § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence corrective advertising.

### SECOND CLAIM
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***

127.   The FAL prohibits "mak[ing] any false or misleading advertising claim."

128.   Defendant makes "false [and] misleading advertising claim[s]" by

18

deceiving consumers about how the Product is authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

129.   In reliance on this false and misleading advertising, Plaintiff purchased and/or used the Product without knowledge it is not actually authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

130.   Defendant knew or should have known that the "authentic" representations and omissions were likely to deceive consumers.

131.   Plaintiff and Class Members seek injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

## THIRD CLAIM
### Violation of California's Consumers Legal Remedies Act,
### Cal. Civ. Code § 1750, *et seq.*

132.   The CLRA adopts a statutory scheme prohibiting deceptive practices in connection with the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes.

133.   Defendant's policies, acts, and practices were designed to, and did, result in the purchase and/or use of the Product primarily for personal, family, or household purposes, and violated and continue to violate sections of the CLRA, including:

(a) Civil Code § 1770(a)(5), because Defendant represented that the Product had characteristics, attributes, features, capabilities, uses, benefits, and/or qualities it did not have;

(b) Civil Code § 1770(a)(9), because Defendant advertised the Product with an intent not to sell it as advertised; and

(c) Civil Code § 1770(a)(16), because Defendant represented that the Product had been supplied in accordance with its previous representations, when it was not.

134.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff has or will send a CLRA Notice to Defendant concurrently with the filing of this action or shortly thereafter, which details and includes these violations of the CLRA, demand correction of these violations, and provide the opportunity to correct these business practices.

135.   If Defendant does not correct these business practices, Plaintiff will amend or seek leave to amend the Complaint to add claims for monetary relief, including restitution and actual damages under the CLRA, and injunctive relief to enjoin the unlawful methods, acts and practices alleged, pursuant to Cal. Civ. Code § 1780.

## FOURTH CLAIM
### Breach of Express Warranty

136.   The Product was manufactured, identified, marketed and sold by Defendant and expressly warranted to Plaintiff that the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

137.   Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

138.   Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as pro-stock, on-ice game-ready hockey jerseys with features like a fight strap, real pressed dimples, stitched logos, names, and numbers, and developed its marketing and labeling to directly meet their needs and desires.

139.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

140.   Defendant affirmed and promised that the Product was authentic,

understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

141.   Defendant described the Product so Plaintiff and consumers believed it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, which became part of the basis of the bargain that it would conform to its affirmations and promises.

142.   Plaintiff recently became aware of Defendant's breach of the Product's warranties.

143.   Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

144.   Defendant received notice and should have been aware of these issues due to complaints by third parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

145.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and members of the proposed Class, pray for judgment and relief as follows:

A.   Certification of the Class, designating Plaintiff as representative of the Class and Plaintiff's Counsel as counsel for the Class;

B.   A declaration that Defendant has committed the violations alleged;

C.   For injunctive relief the Court deems appropriate;

D.   For restitution and disgorgement pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and Cal Civ. Code § 1780, except for monetary damages under the CLRA;

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*

1    E.    Compensatory damages, the amount of which is to be determined at trial,

2            except for monetary damages under the CLRA;

3    F.    For punitive damages;

4    G.    For attorneys' fees;

5    H.    For costs of suit incurred;

6    I.    For pre- and post-judgment interest; and

7    J.    For such further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action so triable.

Dated:   October 18, 2023

Respectfully submitted,

*/s/ Manfred P. Muecke*

Manfred P. Muecke (SBN 222893)
**Manfred, APC**
600 W Broadway Ste 700
San Diego CA 92101
Tel: (619) 550-4005
Fax: (619) 550-4006
mmuecke@manfredapc.com

Spencer Sheehan*
**Sheehan & Associates, P.C.**
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice* Forthcoming

CLASS ACTION COMPLAINT
*Ibach v. Adidas America, Inc.*